# IN THE SUPREME COURT OF IOWA

No. 13–1627

Filed June 12, 2015

**IOWA INSURANCE INSTITUTE, IOWA DEFENSE COUNSEL ASSOCIATION, IOWA SELF-INSURERS' ASSOCIATION, PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES,** and **IOWA ASSOCIATION OF BUSINESS AND INDUSTRY,**

Appellants,

vs.

**CORE GROUP OF THE IOWA ASSOCIATION FOR JUSTICE; CHRISTOPHER J. GODFREY,** Workers' Compensation Commissioner, Division of Workers' Compensation; and **THE IOWA DEPARTMENT OF WORKFORCE DEVELOPMENT,**

Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

Several professional and trade associations comprised of employers, attorneys, and insurance carriers seek further review after the district court and court of appeals affirmed the workers' compensation commissioner's ruling on a petition for declaratory order. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Joseph A. Happe, Stephen M. Morain, Elizabeth R. Meyer, and Sarah K. Franklin of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellants.

R. Saffin Parrish-Sams of Soldat & Parrish-Sams, PLC, West Des Moines, for appellees.

**MANSFIELD, Justice.**

In this case we are asked to determine whether the workers' compensation commissioner correctly interpreted Iowa Code section 85.27(2) as overriding the work product immunity and therefore requiring the disclosure of surveillance video of any claimant seeking workers' compensation benefits before the claimant is deposed. For the reasons set forth herein, we conclude that section 85.27(2) is limited to health-care-related privileges such as the physician–patient privilege. Section 85.27(2), in other words, does not affect privileges and protections related to the litigation process such as the work product doctrine. Accordingly, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand this proceeding to the commissioner.

We decline to address a number of follow-on questions related to the work product doctrine in Iowa; our present holding is simply that section 85.27(2) does not affect the work product doctrine and does not give the commissioner authority to require the disclosure of anything that would otherwise be protected as work product.

## I. Background Facts and Proceedings.

Under the Iowa Administrative Procedure Act (IAPA), "Any person may petition an agency for a declaratory order as to the applicability to specified circumstances of a statute, rule, or order within the primary jurisdiction of the agency." Iowa Code § 17A.9(1)(*a*) (2011). The Iowa Workers' Compensation Commissioner has adopted a corresponding rule allowing any person to petition the commissioner for a declaratory order. Iowa Admin. Code r. 876—5.1. On April 20, 2012, pursuant to section 17A.9(1)(*a*) and rule 876—5.1, the Workers' Compensation Core Group of

the Iowa Association for Justice (Core Group)[1] filed a petition for declaratory order with the commissioner. The petition sought a determination whether Iowa Code section 85.27(2)[2] mandates that employers or insurance carriers defending workers' compensation claims must immediately provide copies of surveillance videos, photographs, and reports concerning the claimant's physical or mental condition upon receiving a properly phrased discovery request.

Core Group asked the commissioner to answer ten related questions:

a) Is Iowa Code § 85.27(2) applicable to surveillance in workers' compensation claims?

b) Pursuant to Iowa Code § 85.27, are all privileges waived with respect to surveillance videos and photographs showing the injured worker?

c) Pursuant to Iowa Code § 85.27, are all privileges waived with respect to surveillance reports concerning the injured worker?

---

[1]Core Group members are attorneys who represent injured workers in workers' compensation claims.

[2]Section 85.27(2) provides:

Any employee, employer or insurance carrier making or defending a claim for benefits agrees to the release of all information to which the employee, employer, or carrier has access concerning the employee's physical or mental condition relative to the claim and further waives any privilege for the release of the information. The information shall be made available to any party or the party's representative upon request. Any institution or person releasing the information to a party or the party's representative shall not be liable criminally or for civil damages by reason of the release of the information. If release of information is refused the party requesting the information may apply to the workers' compensation commissioner for relief. The information requested shall be submitted to the workers' compensation commissioner who shall determine the relevance and materiality of the information to the claim and enter an order accordingly.

Iowa Code § 85.27(2).

d) Pursuant to Iowa Code § 85.27, are Defendants required to produce surveillance videos, photos, and/or reports when asked for in appropriate discovery requests?

e) Pursuant to Iowa Code § 85.27, are Defendants permitted to withhold surveillance videos, photos, and/or reports until after deposing the injured worker?

f) Pursuant to Iowa Code § 85.27, when are Defendants required to produce surveillance videos, photos and/or reports?

g) Pursuant to Iowa Code § 85.27, if the information is requested in an interrogatory, is there any privilege against or valid objection to identifying the fact that surveillance was performed, the form of surveillance conducted, who performed it, when it was performed, and who has possession of it?

h) Pursuant to Iowa Code § 85.27, if the information is requested in an interrogatory, when must Defendants identify the fact surveillance was performed, the form of surveillance conducted, who performed it, when it was performed, and who has possession of it?

i) In the event that [questions "a" or "b"] are answered "NO," if Defendants assert a privilege in response to a request for production of surveillance, are they also required to provide a privilege log under Iowa Rule of Civil Procedure 1.503(5) which identifies the fact surveillance was performed, the form of surveillance conducted, who performed it, when it was performed, and who has possession of it?

j) Pursuant to Iowa Code § 85.27, can an injured worker move to compel production of surveillance videos, photos and/or reports, and for appropriate sanctions, under Iowa Rule of Civil Procedure 1.517?

Core Group further provided its proposed answers to these questions: Section 85.27(2) applies to surveillance materials; all privileges otherwise justifying withholding of surveillance materials when requested in discovery are waived; and employers or insurance carriers must disclose surveillance materials promptly when requested without first taking the claimant's deposition.

Desiring input from multiple organizations representing various interests in workers' compensation proceedings, the commissioner

invited interested parties to intervene. *See generally* Iowa Code § 17A.9(4); Iowa Admin. Code r. 876—5.3. Four professional and trade associations, including the Iowa Insurance Institute, intervened.[3]

On June 26, the commissioner held a hearing on the petition for declaratory order. At the hearing, Core Group asserted section 85.27(2) applies to surveillance materials because surveillance footage, photographs, and reports are "information . . . concerning the employee's physical or mental condition relative to the claim." *See* Iowa Code § 85.27(2). In response, the Institute as a threshold matter contended the commissioner should decline to rule on the petition for declaratory order because the issue would be better resolved in a contested case proceeding. The Institute urged that the declaratory order framework might leave out several necessary parties and that Core Group lacked standing to petition for a declaratory order. *See* Iowa Code

[3]The intervenors represent the interests of various employers, insurers, and attorneys. In its petition for intervention, the Iowa Insurance Institute explained it "is an association composed of Iowa based property/casualty insurance companies and out of state property/casualty insurance companies that write significant volumes of coverage in Iowa." The Iowa Defense Counsel Association (IDCA) and the Iowa Self Insurers' Association (ISIA) joined Iowa Insurance Institute's petition for intervention. IDCA explained it "is an organization comprised of approximate[ly] 335 lawyers and claims professionals actively engaged in the practice of law or in work relating to handling of claims or defense of legal actions." ISIA is an organization whose members are self-insured Iowa employers and therefore may be involved in workers' compensation proceedings from time to time. Property Casualty Insurers Association of America (PCI) intervened separately to raise procedural objections to the declaratory order petition. PCI's members also write workers' compensation insurance in Iowa.

Two other trade associations—the National Association of Mutual Insurance Companies (NAMIC) and the Iowa Association of Business and Industry (IABI)—intervened after the case reached the district court. NAMIC and IABI joined in the legal arguments presented by the Iowa Insurance Institute, IDCA, ISIA, and PCI. In the petition for intervention, NAMIC explained it "is a trade association of approximately 1400 mutual property and casualty insurance companies, some of whom issue Workers' Compensation coverage to employers in . . . Iowa." IABI explained it "is an organization of over 1400 Iowa businesses [that] employ over 300,000 persons covered by Iowa's Workers' Compensation Act." We refer to all six intervenors collectively as "the Institute."

§ 17A.9(1)(*b*)(2) ("[A]n agency shall not issue a declaratory order that would substantially prejudice the rights of a person who would be a necessary party and who does not consent in writing to the determination of the matter by a declaratory order proceeding."); Iowa Admin. Code r. 876—5.9(1)(2) (providing the commissioner "may refuse to issue a declaratory order" if "[t]he petition does not contain facts sufficient to demonstrate that the petitioner will be aggrieved or adversely affected" if an order is not issued). The Institute further asserted that if the commissioner ruled on the petition, he should conclude section 85.27(2) does not mandate that employers disclose surveillance materials before deposing a claimant.

On October 23, the commissioner ruled on the petition for declaratory order. The commissioner concluded section 85.27(2) applies to surveillance materials and waives the work product privilege except to the extent that requested materials contain "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *See Squealer Feeds v. Pickering*, 530 N.W.2d 678, 689 (Iowa 1995) (internal quotation marks omitted), *abrogated on other grounds by Wells Dairy, Inc. v. Am. Indus. Refrigeration, Inc.*, 690 N.W.2d 38, 47–48 (Iowa 2004). He further concluded employers or insurers must produce surveillance materials upon request from a claimant and may not withhold the materials until after deposing the claimant.

The ruling relied on a literal interpretation of the phrase "all information" in rejecting the Institute's assertion that section 85.27(2) refers only to the release of medical records and reports. Additionally, the commissioner acknowledged surveillance materials are used to test a claimant's veracity, but noted "the veracity [being tested] relates to the

claimant's physical or mental condition" and is therefore included within section 85.27(2). Finally, the commissioner concluded predeposition disclosure of surveillance materials does not vitiate all impeachment value, stating, "An implausible answer as to why a claimant was shown in surveillance performing certain physical activities will still impeach a claimant's testimony."

The commissioner's ruling addressed questions (a) through (h) and (j) presented by Core Group and was based entirely on the commissioner's interpretation of Iowa Code section 85.27(2). The commissioner did not reach question (i), the only question that did not involve interpretation of section 85.27(2).

The Institute sought judicial review in the district court. *See generally* Iowa Code § 17A.19(10) (setting forth grounds on which a district court reviewing agency action may grant relief from that agency action). The district court affirmed the commissioner's ruling in its entirety.

The Institute appealed, and we transferred the case to the court of appeals. The court of appeals likewise affirmed the commissioner's declaratory order, with one member of the panel dissenting. The Institute sought, and we granted, further review.

## II. Standard of Review.

We must resolve three questions: (1) whether section 17A.9 prohibited the commissioner from ruling on the petition for declaratory order, (2) whether the commissioner should have declined to issue a ruling for reasons set forth in the agency's rules, and (3) whether the commissioner's interpretation of section 85.27(2) is correct.

Iowa Code section 17A.9(1)(*b*)(2) states an agency "shall not issue a declaratory order that would substantially prejudice the rights of a

person who would be a necessary party." Relying on this section, the Institute asserts the declaratory order proceedings left out necessary parties who would be substantially prejudiced, and therefore, the commissioner's decision to rule exceeded his authority. The parties agree that our review of this point is for correction of errors at law.

Section 17A.9(1)(*b*)(1) provides that an agency shall not issue a declaratory order when it "determines that issuance of the order under the circumstance would be contrary to a rule" adopted by the agency. Iowa Code § 17A.9(1)(*b*)(1). The commissioner's rules list several circumstances when the commissioner "may refuse to issue a declaratory order." Iowa Admin. Code r. 876—5.9(1). We review the commissioner's exercise of this discretion for an abuse of discretion.

We also review the commissioner's actual interpretation of Iowa Code section 85.27(2) for errors at law. *See* Iowa Code § 17A.19(10)(*c*). In recent years, we have repeatedly declined to give deference to the commissioner's interpretations of various provisions in chapter 85. *See Staff Mgmt. v. Jimenez*, 839 N.W.2d 640, 648 (Iowa 2013) ("In our prior cases, we held the legislature has not delegated any interpretive authority to the workers' compensation commissioner to interpret Iowa Code chapter 85."); *Waldinger Corp. v. Mettler*, 817 N.W.2d 1, 7 (Iowa 2012) (holding that the commissioner was not clearly vested with interpretive authority for section 85.34(1)); *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 519 (Iowa 2012) (concluding the legislature "did not vest the authority to interpret the phrase 'suitable work' for purposes of Iowa Code section 85.33(3) in the . . . commission[er]"); *Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 261 (Iowa 2012) ("[W]e will substitute our own interpretation of sections 85.36 and 85.61(3) if we find the commissioner's interpretation was erroneous."); *Swiss Colony, Inc. v.*

*Deutmeyer*, 789 N.W.2d 129, 133 (Iowa 2010) ("Using the refined standard in *Renda* [*v. Iowa Civil Rights Commission*, 784 N.W.2d 8, 11 (Iowa 2010)], we are not convinced the legislature intended to vest the commissioner with the authority to interpret Iowa Code section 85.34(5)."). Additionally, any terms of section 85.27(2) at issue here are "not uniquely within the subject matter expertise of the agency." *Renda*, 784 N.W.2d at 14.

**III. Analysis.**

**A. The Commissioner's Decision to Rule on Core Group's Petition.** We first address the Institute's contention that the commissioner should not have issued a declaratory order for either of the two reasons set forth in Iowa Code section 17A.9. Iowa Code section 17A.9 establishes the procedure for agencies to issue declaratory orders. In a recent case, we held a party "fail[s] to exhaust administrative remedies by not seeking a declaratory order under section 17A.9(1)(*a*) prior to petitioning for judicial review." *Sierra Club Iowa Chapter v. Iowa Dep't of Transp.*, 832 N.W.2d 636, 643, 648 (Iowa 2013). We determined the legislature intended declaratory orders to serve as a practical alternative to judicial declaratory judgments. *See id.* at 646–47.

The original version of Iowa Code section 17A.9 was only two sentences long. *See Sierra Club*, 832 N.W.2d at 643. In 1998, the general assembly adopted an amended version of section 17A.9, based upon the 1981 amendments to the Model State Administrative Procedure Act. *See id.* The post-1998 version of section 17A.9 provides that an agency "shall" issue a declaratory order when petitioned to do so unless the agency determines that issuance of an order "would be contrary to a rule" or the order "would substantially prejudice the rights of a person who would be a necessary party and who does not consent in writing to

the determination of the matter by a declaratory order proceeding." Iowa Code § 17A.9(1)(*b*)(1)–(2). The section goes on to require each agency to adopt rules "describ[ing] the classes of circumstances in which the agency will not issue a declaratory order." *Id.* § 17A.9(2).

Professor Arthur Bonfield, the reporter–draftsperson for the 1998 amendments, provided the following explanation regarding the revised version of Iowa Code section 17A.9 and the situations when declaratory orders should not be issued:

> This section repeals the declaratory order provision contained in current IAPA section 17A.9. Iowa law has not previously required that an agency issue a ruling, and has not contemplated indispensable parties in the declaratory order proceeding. Under this proposed provision, however, an agency is *required* to issue a declaratory order unless (i) such an order is contrary to a rule properly adopted by the agency in accordance with subsection (2), or (ii) such an order substantially prejudices the rights of any person who would be an indispensable party to the proceeding and who has not consented in writing to a determination of the matter by a declaratory order. In the first case, the rule adopted by the agency must delineate the circumstances in which a declaratory order will not be issued. In the second case, note that some indispensable parties might refuse to consent because, in a declaratory order proceeding, they lack many of the procedural rights to which they are entitled in a contested case proceeding.

Arthur Earl Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 37 (1998) (hereafter Bonfield).[4]

---

[4]This explanation is similar to the official comment to the 1981 model act:

> [A]s subsection (a) makes clear, an agency *must* issue a declaratory order upon receipt of a proper petition therefor unless it determines that under the particular circumstances its issuance would either (1) be contrary to a rule issued in accordance with subsection (b) [enacted as subsection (2) in Iowa], or (2) would substantially prejudice the rights of any persons who would be indispensable parties to the proceeding and do not consent to determination of the matter by a declaratory order.

1. *Whether a necessary party would be substantially prejudiced.* The Institute asserts numerous employers and insurers did not participate in the declaratory order proceedings but should be deemed necessary parties. *See* Iowa Code § 17A.9(1)(*b*)(2). However, the Institute has not identified any specific necessary parties that did not participate in the declaratory order proceedings and has not explained how the interests of any nonparticipants might differ from the broad range of interests represented by the Institute.

Ultimately, we conclude that even if some necessary parties did not participate in the declaratory order proceedings, the commissioner's decision to rule did not substantially prejudice them. According to its own petition for intervention, the Institute "collectively represent[s] the majority of workers' compensation Defendants in Iowa, and many of their legal advocates." In the same petition, though, the Institute stated that it did "not have authority to bind [its] members to the determination of the matters presented in this declaratory order proceeding." *See* Iowa Admin. Code r. 876—5.12 (indicating that a declaratory order "is binding [only] on the . . . commissioner, the petitioner, and any intervenors who consent to be bound").

This tightrope walk by the Institute demonstrates to us that the requirements of Iowa Code 17A.9(1)(*b*)(2) have been satisfied. Practically speaking, the commissioner's declaratory order—especially once reviewed by this court—can affect nonparties as a precedent. But of course that is true of any declaratory order, and any contested case proceeding as well. *See* Iowa Admin. Code r. 876—5.12 ("A declaratory order has the same

_____

Model State Admin. Procedure Act § 2-103 cmt. (amended 1981), 15 U.L.A. 27 (2000).

status and binding effect as a final order issued in a contested case proceeding."). We think the prejudice must be more than just precedential effect,[5] especially when a broad range of interests were represented in the declaratory order proceeding and the Institute cannot identify an interest that was not represented. The commissioner correctly concluded section 17A.9(1)(*b*)(2) did not preclude a ruling on Core Group's petition.

2. *Agency rules.* Pursuant to the mandate in section 17A.9(2), the commissioner has adopted regulations guiding the decision whether to rule on declaratory order petitions. *See* Iowa Code § 17A.9(2); Iowa Admin. Code r. 876—5.9. The agency's rule provides the commissioner "shall not issue a declaratory order where prohibited by Iowa Code section 17A.9(1)." Iowa Admin. Code r. 876—5.9(1). Additionally, the regulations provide the commissioner "may refuse to issue a declaratory order on some or all questions" if one or more criteria are satisfied. *Id.* r. 876—5.9(1). Three of these criteria are pertinent here: subsections (2), (5), and (9). *Id.* r. 876—5.9(1)(2), (5), (9).

Subsection (2) allows the commissioner to refuse to rule if he or she concludes "[t]he petition does not contain facts sufficient to demonstrate that the petitioner will be aggrieved or adversely affected" if the commissioner does not issue an order. *Id.* r. 876—5.9(1)(2). Subsection (5) allows the commissioner to decline to rule if he or she determines "[t]he questions presented by the petition would more

_____

[5]The term "indispensable party" normally means someone whose interests will be more directly affected than by the precedential effect of a ruling. *See Sear v. Clayton Cnty. Zoning Bd. of Adjustment*, 590 N.W.2d 512, 517 (Iowa 1999) (stating that parties who had obtained a variance as the result of a zoning decision were indispensable parties to a certiorari proceeding challenging the decision because "[b]y annulling the special variance they had been granted, the actions of the district court necessarily affected the Sears' interest in their land").

properly be resolved in a different type of proceeding or by another body with jurisdiction over the matter." *Id.* r. 876—5.9(1)(5). Subsection (9) authorizes the commissioner to refuse to rule if he or she determines a ruling "would necessarily determine the legal rights, duties, or responsibilities of other persons . . . whose position on the questions presented may fairly be presumed to be adverse to that of petitioner." *Id.* r. 876—5.9(1)(9).

The Institute asserts the "aggrieved or adversely affected" standard under subsection (2) is tantamount to a requirement that Core Group demonstrate standing. *See id.* r. 876—5.9(1)(2); *see also* Bonfield at 37–38 (noting that "an agency may include in its rules reasonable standing, ripeness, and other requirements for obtaining a declaratory order"). We have often referred to similar language as a requirement that parties seeking judicial review under chapter 17A demonstrate standing. *See City of Des Moines v. Pub. Emp't Relations Bd.*, 275 N.W.2d 753, 759 (Iowa 1979); *see also Richards v. Iowa Dep't of Revenue & Fin.*, 454 N.W.2d 573, 575 (Iowa 1990); *Iowa Power & Light Co. v. Iowa State Commerce Comm'n*, 410 N.W.2d 236, 239 (Iowa 1987). We have not decided, however, what standing a party must have to initiate declaratory order proceedings.[6]

It is noteworthy that "[s]ection 17A.9 contemplates rulings based on purely hypothetical facts, and renders them subject to review." *Women Aware v. Reagen*, 331 N.W.2d 88, 92 (Iowa 1983); *accord City of Des Moines*, 275 N.W.2d at 758; *cf. Tindal v. Norman*, 427 N.W.2d 871,

---

[6]In *Women Aware v. Reagen*, the agency declined to rule on a petition for declaratory order in part because the petition "failed to show petitioners had standing to challenge [the agency's prior decision]." 331 N.W.2d 88, 89 (Iowa 1983). However, we resolved that case on other grounds without reaching the standing issue. *See id.* at 93.

873 (Iowa 1988) (concluding the declaratory order procedure was inapplicable in a case presenting an actual controversy because "section 17A.9 contemplates rulings on purely hypothetical sets of facts, not on concrete challenges"). This means that in many declaratory order proceedings, it is possible *no* party can demonstrate the type of concrete or imminent particularized injury we typically require for standing in contested cases.

The commissioner's rules are discretionary; they provide that the commissioner "*may* refuse to issue a declaratory order . . . for the following reasons." Iowa Admin. Code r. 876—5.9(1) (emphasis added). Whether or not Core Group would be aggrieved or adversely affected if its request for a declaratory order were denied, the commissioner could have concluded "the importance and nature of the questions [to be] decided" would justify dispensing with a strict standing requirement. *City of Des Moines*, 275 N.W.2d at 759 (concluding the mootness doctrine should not preclude judicial review of a declaratory order proceeding due to the important questions at issue). We conclude the commissioner did not abuse his discretion in deciding to rule on Core Group's petition notwithstanding rule 876—5.9(1)(2).

Next, the Institute contends the commissioner should have declined to rule because, under subsection (5), "[t]he questions presented by the petition would more properly be resolved in a different type of proceeding"—specifically, either a contested case proceeding or a rulemaking proceeding. *See* Iowa Admin. Code r. 876—5.9(1)(5). Relatedly, the Institute asserts the commissioner's ruling establishes an improper one-size-fits-all rule that does not allow for consideration of factual nuances in future contested cases. At the same time, the Institute also criticizes the commissioner's ruling for promulgating a

sweeping rule, when declaratory orders are intended to provide only comparatively narrow advice for parties requesting them. *See* Arthur Earl Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, the Rulemaking Process,* 60 Iowa L. Rev. 731, 813 (1975) (suggesting agencies "should require great specificity and precision" in petitions for declaratory orders so that agencies are not "bombarded with petitions seeking answers to . . . excessively general fact situations").

The legislature has granted agencies multifaceted authority. Agencies assert their authority in a quasi-judicial way when deciding contested cases; and beyond the realm of contested cases, agencies utilize the authority vested in them by the legislature when they promulgate rules and rule on petitions for declaratory orders. *Compare* Iowa Code § 17A.4, *with id.* § 17A.9, *with id.* §§ 17A.15–.16. Agency action through the exercise of one of these manifestations of authority does not foreclose action through another. *See Lenning v. Iowa Dep't of Transp.*, 368 N.W.2d 98, 102 (Iowa 1985) (concluding agencies can develop legal principles through contested cases *and* rulemaking procedures, without limiting themselves to one or the other); *Young Plumbing & Heating Co. v. Iowa Natural Res. Council*, 276 N.W.2d 377, 382 (Iowa 1979) ("Either means may be used so long as the statutory procedure is complied with."). While the commissioner would have been within his discretion in declining to issue a declaratory order here, he did not abuse that discretion in going forward. The issues that he reached were purely legal, as acknowledged by the Institute at oral argument. And the commissioner received input from diverse parties, as would have likely occurred in a rulemaking. Accordingly, the prospect that the commissioner could address the discoverability of surveillance materials

in a contested case or in an agency rule does not foreclose his issuance of a declaratory order on the same subject.

Lastly, the Institute contends that the commissioner should not have ruled on Core Group's petition because it had the effect of "necessarily determin[ing] the legal rights, duties, or responsibilities of other persons . . . whose position on the questions presented may fairly be presumed to be adverse to that of petitioner."  Iowa Admin. Code r. 876—5.9(9).  We find no abuse of discretion under the circumstances presented here.  As explained above, the commissioner solicited, and received, submissions from parties opposed to Core Group's petition.

**B.  Whether Section 85.27(2) Applies to Surveillance Materials.** Having concluded the commissioner acted within his discretion in ruling on the petition, we turn to the underlying question: What effect does Iowa Code section 85.27(2) have on surveillance materials?  Specifically, we must determine whether "all information . . . concerning the employee's physical or mental condition relative to the claim" includes work product that was obtained after the claim was filed and that may shed light on the employee's condition or whether the phrase is limited to records and information normally kept by health care providers.  Furthermore, if section 85.27(2) applies to work product, we must also determine whether it requires that the relevant information must be turned over to the requesting party immediately or whether the employer can withhold the material until the claimant is deposed.

Section 85.27(2) provides:

> Any employee, employer or insurance carrier making or defending a claim for benefits agrees to the release of all information to which the employee, employer, or carrier has access concerning the employee's physical or mental condition relative to the claim and further waives any privilege for the release of the information.  The information

shall be made available to any party or the party's representative upon request. Any institution or person releasing the information to a party or the party's representative shall not be liable criminally or for civil damages by reason of the release of the information. If release of information is refused the party requesting the information may apply to the workers' compensation commissioner for relief. The information requested shall be submitted to the workers' compensation commissioner who shall determine the relevance and materiality of the information to the claim and enter an order accordingly.

Iowa Code § 85.27(2).

Core Group contends that the phrase "all information . . . concerning the employee's physical or mental condition relative to the claim" means the legislature intended the section to apply to surveillance footage, photographs, and reports. Core Group further contends that the reference to "waives any privilege" includes waiver of the work product protection and that the relevant surveillance materials must be disclosed before deposing the claimant in a given case. The Institute, on the other hand, contends the section should be interpreted more narrowly to apply only to health care provider records.

1. *Surveillance as work product.* Before delving into the meaning of Iowa Code section 85.27(2) ourselves, we believe it is helpful to discuss the potential status of surveillance as work product under the Iowa Rules of Civil Procedure.[7] Iowa Rule of Civil Procedure 1.503(3) protects materials "prepared in anticipation of litigation." Iowa R. Civ. P. 1.503(3); *see also Keefe v. Bernard,* 774 N.W.2d 663, 673 (Iowa 2009). The Iowa rule resembles Federal Rule of Civil Procedure 26(b)(3), "and the history

---

[7]Those rules generally apply in workers' compensation proceedings unless otherwise superseded. *See* Iowa Admin. Code r. 876—4.35 ("The rules of civil procedure shall govern the contested case proceedings before the workers' compensation commissioner unless the provisions are in conflict with these rules and Iowa Code chapters 85, 85A, 85B, 86, 87 and 17A, or obviously inapplicable to the workers' compensation commissioner.").

and cases under the federal rule provide guidance in interpreting the Iowa counterpart." *Ashmead v. Harris*, 336 N.W.2d 197, 199 (Iowa 1983) (citing Fed. R. Civ. P. 26(b)), *abrogated on other grounds by Wells Dairy*, 690 N.W.2d at 47–48.

Iowa Rule of Civil Procedure 1.503(3) and Federal Rule of Civil Procedure 26(b)(3) provide specific parameters for the work product doctrine:

> Like its federal counterpart, Iowa Rule of Civil Procedure 1.503(3) provides for production of "documents and tangible things" that have been "prepared in anticipation of litigation" by opposing counsel "only upon a showing that the party seeking discovery has substantial need of the materials . . . and . . . is unable without undue hardship to obtain the substantial equivalent of the materials by other means." This rule requires the court, however, to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney" when ordering such discovery.

*Keefe*, 774 N.W.2d at 673 (alteration in original) (quoting Iowa R. Civ. P. 1.503(3)); *see also* Fed. R. Civ. P. 26(b)(3).

There are "two tiers of work product recognized by Iowa rule 1.503(3)." *Keefe*, 774 N.W.2d at 674; *see also Squealer Feeds*, 530 N.W.2d at 689 ("[A] claimant must focus on the availability from other sources of the *facts* necessary to establish his claim . . . . [I]n no event are the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation discoverable." (Internal quotation marks omitted.)). In the lower tier, work product containing or consisting of relevant facts may be "discoverable upon a showing of substantial need and undue hardship." *Keefe*, 774 N.W.2d at 674 (internal quotation marks omitted). The upper tier insulates from discovery any work product revealing attorneys'

mental impressions and conclusions—"[t]hose materials are absolutely immune." *Squealer Feeds*, 530 N.W.2d at 689.

To constitute work product, something must be (1) a document or tangible thing, (2) prepared in anticipation of litigation, and (3) prepared by or for another party or by or for that party's representative. *See* Iowa R. Civ. P. 1.503(3). In 2004, we adopted a new standard for determining whether a document or tangible thing is prepared in anticipation of litigation. *See Wells Dairy*, 690 N.W.2d at 48. If a document or tangible thing may fairly be said to have been prepared or obtained because litigation is foreseeable or ongoing, it constitutes work product; litigation need not be the primary reason for creating or obtaining the materials. *See id.* ("Rule 1.503(3) merely requires a document to be prepared in anticipation of litigation. It does not require the primary purpose motivating the creation of the document to be to aid in litigation.").

It is clear that surveillance materials are documents or tangible things, prepared in anticipation of litigation, by or for another party or that party's representative. We therefore agree with the prevailing view in jurisdictions following the federal definition of work product that surveillance materials are protected, lower-tier materials, at least initially. *See Wegner v. Cliff Viessman, Inc.*, 153 F.R.D. 154, 159 (N.D. Iowa 1994) ("Surveillance materials are certainly prepared in anticipation of litigation."); *Huet v. Tromp*, 912 So. 2d 336, 339 (Fla. Dist. Ct. App. 2005) ("Clearly any documents, reports or video tapes prepared by the investigators are now protected by the work product privilege."); *Pioneer Lumber, Inc. v. Bartels*, 673 N.E.2d 12, 17 (Ind. Ct. App. 1996) ("[I]t seems needless to record the activities of the claimant unless it is anticipated that those recordings will be used against the claimant during litigation."); *Cabral v. Arruda*, 556 A.2d 47, 49 (R.I. 1989) (holding

that surveillance material is "work product" that is "qualifiedly immune from discovery"); *In re Weeks Marine*, 31 S.W.3d 389, 391 (Tex. Ct. App. 2000) ("[T]he surveillance report that includes photographs of Martinez and the video tape are privileged as work product."). *But see Shields v. Burlington N. & Santa Fe Ry.*, 818 N.E.2d 851, 855 (Ill. App. Ct. 2004) (finding that surveillance is not work product under the Illinois definition, which differs from the federal definition and does not offer protection to materials that do not reveal "any mental processes or other such conceptual data"); *Moak v. Ill. Cent. R.R.*, 631 So. 2d 401, 404 (La. 1994) (finding that surveillance is not work product under Louisiana law because Louisiana's work product exclusion refers only to "writing" and not to other tangible things like videos or photographs); *Dominick v. Hanson*, 753 A.2d 824, 826 (Pa. Super. Ct. 2000) ("Although this evidence constitutes work product because it is prepared solely in anticipation of litigation, [Pennsylvania Rule of Civil Procedure] 4003.3 provides that work product is discoverable, with the exception of the mental impressions and opinions of the party's attorney and other representatives.").

The consensus also seems to be that surveillance loses the status of protected work product once a determination is made that the surveillance will be used at trial. *Donovan v. AXA Equitable Life Ins. Co.*, 252 F.R.D. 82, 82 (D. Mass. 2008) (finding that surveillance, if it will be used at trial, must be produced in discovery once the plaintiff has been deposed); *Dodson v. Persell*, 390 So. 2d 704, 707–08 (Fla. 1980) (finding the contents of surveillance films and materials are subject to discovery where they are to be presented at trial but that allowing the discovery deposition before disclosure "is an appropriate middle road to ensure that all relevant evidence reaches the trier of fact in a fair and accurate

fashion"); *see also Wegner*, 153 F.R.D. at 159 (finding a substantial need exists for production when the materials will be used against the plaintiff at trial); *Pioneer Lumber*, 673 N.E.2d at 17 ("Bartels has a substantial need for the tape only if Pioneer and Wiesemann intend to present it at trial."); *Cabral*, 556 A.2d at 50 (holding that a substantial need exists for production of surveillance once a decision is made to use it at trial, but the surveillance can be withheld until after deposition).

2. *Is Iowa Code section 85.27(2) ambiguous?* Our first step in interpreting section 85.27(2) is to determine whether the phrase "all information . . . concerning the employee's physical or mental condition relative to the claim" is ambiguous. Iowa Code § 85.27(2). Again, in the view of Core Group, it applies to any information that may *bear upon* the employee's physical or mental condition, including otherwise protected work product. According to the Institute, it applies only to information that addresses the employee's physical or mental condition *directly*, as a health care provider record would, rather than inferentially.[8]

" 'A statute is ambiguous if reasonable minds could differ or be uncertain as to the meaning of the statute.' " *Mall Real Estate, L.L.C. v. City of Hamburg*, 818 N.W.2d 190, 198 (Iowa 2012) (quoting *Sherwin–Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 424 (Iowa 2010)). We have said that "[a]mbiguity may arise from specific language used in

---

[8]One parallel to this current debate exists under federal bankruptcy law. Title 11, section 523(a)(2)(B) excepts from discharge debts that were obtained by use of a materially false written statement "respecting the debtor's . . . financial condition." 11 U.S.C. § 523(a)(2)(B) (2012). Different views have emerged in the courts over how to interpret the phrase "statement . . . respecting the debtor's . . . financial condition." *See In re Kosinski*, 424 B.R. 599, 608–10 (B.A.P. 1st Cir. 2010). Under one view, any statement that has a bearing on the debtor's financial condition is included; under another, the statement must at least informally describe the debtor's overall financial condition. *See id.*

a statute or when the provision at issue is considered in the context of the entire statute or related statutes." *Id.* (quoting *Sherwin–Williams Co.*, 789 N.W.2d at 425). In other words, even if the meaning of words might seem clear on their face, their context can create ambiguity.

That is because we read statutes as a whole rather than looking at words and phrases in isolation. *See, e.g., Phillips v. Chi. Cent. & Pac. R.R.*, 853 N.W.2d 636, 649 (Iowa 2014) (noting that statutory terms are often "clarified by the remainder of the statutory scheme" (internal quotation marks omitted)); *Den Hartog v. City of Waterloo*, 847 N.W.2d 459, 462 (Iowa 2014) ("We have often explained we construe statutory phrases not by assessing solely words and phrases in isolation, but instead by incorporating considerations of the structure and purpose of the statute in its entirety."); *In re Estate of Melby*, 841 N.W.2d 867, 879 (Iowa 2014) ("When construing statutes, we assess not just isolated words and phrases, but statutes in their entirety . . . ."); *see also* Iowa Code § 4.1(38) ("Words and phrases shall be construed according to the context and the approved usage of the language . . . .").

As we examine Iowa Code section 85.27 in its entirety, we see that all the other subsections relate to health care services. For example, subsection (1) provides as follows:

> 1. The employer, for all injuries compensable under this chapter or chapter 85A, shall furnish reasonable surgical, medical, dental, osteopathic, chiropractic, podiatric, physical rehabilitation, nursing, ambulance and hospital services and supplies therefor and shall allow reasonably necessary transportation expenses incurred for such services. The employer shall also furnish reasonable and necessary crutches, artificial members and appliances but shall not be required to furnish more than one set of permanent prosthetic devices.

Iowa Code § 85.27(1); *see also id.* § 85.27(3) (providing that disputed "health service provider charges" may be referred to the commissioner for

determination); *id.* § 85.27(4) (discussing the furnishing and cost of "reasonable services and supplies to treat an injured employee"); *id.* § 85.27(5) (requiring an employer to "repair or replace" any "artificial member or orthopedic device . . . damaged or made unusable by circumstances arising out of and in the course of employment"); *id.* § 85.27(6) (providing that while a contested case is pending before the commissioner, "no debt collection . . . shall be undertaken against an employee . . . for the collection of charges for . . . treatment rendered an employee by any health service provider"); *id.* § 85.27(7) (discussing when an employee is entitled to pay following "sustaining a compensable injury").

Thus, when the legislature adopted subsection (2) in 1976, it stuck it within an existing provision (section 85.27) that concerned health care services. This would be an unusual place to situate a provision intended to override the litigation work product doctrine. It also tends to support the Institute's view that section 85.27(2) pertains to records of health care services. *See, e.g., State v. Robinson*, 859 N.W.2d 464, 487 (Iowa 2015) (examining the context in which Iowa Code section 804.20 appears in the Code and concluding that it "applies to the period after arrest but prior to the formal commencement of criminal charges").

Hence, after considering both the wording of section 85.27(2) and its context, we conclude that reasonable minds could differ as to whether it encompasses surveillance video of a claimant obtained for litigation purposes. This means we need to resort to our established tools of statutory interpretation.

3. *Other language in section 85.27(2) itself.* In addition to considering section 85.27 as a whole, we must of course focus on the wording of section 85.27(2) itself.

Core Group justifiably attaches significance to the words "all information." *See* Iowa Code § 85.27(2). In a number of past pronouncements, we have indicated that the word "all" is quite broad. For example, we have said that the word "is commonly understood and usually does not admit of an exception, addition or exclusion." *Consol. Freightways Corp. of Del. v. Nicholas*, 258 Iowa 115, 121, 137 N.W.2d 900, 904 (1965); *see also Luttenegger v. Conseco Fin. Servicing Corp.*, 671 N.W.2d 425, 433–34 (Iowa 2003) (noting that when a statute describes "all charges . . . including" four examples, the word "including" cannot create an exclusive list because that "would conflict with the word 'all' " (internal quotation marks omitted)); *Barron v. State Farm Mut. Auto. Ins. Co.*, 540 N.W.2d 423, 426 (Iowa 1995); *Cedar Rapids Cmty. Sch. Dist. v. City of Cedar Rapids*, 252 Iowa 205, 211, 106 N.W.2d 655, 659 (1960) ("The word 'all' is commonly understood, and when so used does not admit of an exception or exclusion not specified."); *In re Peers' Estate*, 234 Iowa 403, 411, 12 N.W.2d 894, 898 (1944) ("[W]e cannot by judicial interpretation nullify the definite pronouncements of the legislature which has particularly declared that the statute in question applies to 'all claims.' ").

Yet in some cases, we have concluded the word "all" means something short of all-inclusive. *See, e.g., In re Estate of Troester*, 331 N.W.2d 123, 126 (Iowa 1983) ("To interpret literally the words 'all orders' . . . to apply to all procedural orders would lead to a[n] undesired result."); *Johnson v. Bd. of Adjustment*, 239 N.W.2d 873, 880–81 (Iowa 1976) (concluding the words "all uses" in a zoning ordinance did not mean every lot was required to satisfy a minimum acreage requirement); *Silver Lake Consol. Sch. Dist. v. Parker*, 238 Iowa 984, 997, 29 N.W.2d 214, 221 (1947) (holding "the word 'all' in various parts of the school

laws" applied only to all *public* schools); *In re Licenses for Sale of Used Motor Vehicles*, 179 N.W. 609, 611 (Iowa 1920) (concluding the words "all vehicles" did not include all *used* vehicles). In short, our precedents do not foreclose us from looking at the word "all" contextually.

The Institute emphasizes other aspects of the wording of Iowa Code section 85.27(2). It points out, for one thing, that the section refers to a waiver of "any privilege" and the work product doctrine is not a privilege, but rather a protection or an immunity. *See* Iowa Code § 85.27(2). This, in the Institute's view, demonstrates that section 85.27(2) does not speak to work product.

As Core Group notes, there are cases where we have used the word "privilege" to refer to the work product immunity. *See, e.g., Wells Dairy*, 690 N.W.2d at 43 ("Iowa Rule of Civil Procedure 1.503(3) creates a qualified privilege . . . ."); *Exotica Botanicals, Inc. v. Terra Int'l, Inc.*, 612 N.W.2d 801, 804–05, 807 (Iowa 2000) (using "work product privilege" in three section headings and referring multiple times to the work product privilege).

However, our occasional lack of precision does not necessarily mean the legislature was being imprecise when it adopted section 85.27(2) in 1976. *See* 1976 Iowa Acts ch. 1084, § 3 (codified at Iowa Code § 85.27(2)). Our pre-1976 caselaw had rather carefully distinguished information covered by the work product immunity from information that was privileged. *See Robbins v. Iowa-Ill. Gas & Elec. Co.*, 160 N.W.2d 847, 855–56 (Iowa 1968) ("[T]he work product of an attorney is clearly distinguishable from the attorney-client privilege. The two concepts often appear side-by-side in the cases since both may involve protection of trial preparations. The attorney-client privilege is, however, generally viewed as an evidentiary privilege belonging to the client and

designed to encourage full disclosure by him to his attorney. On the other hand, the work product concept refers to material prepared or acquired in anticipation of litigation not necessarily privileged but immune from discovery . . . ." (Citation omitted.)); *Bengford v. Carlem Corp.*, 156 N.W.2d 855, 867 (Iowa 1968) ("[S]uch questions are not objectionable either as privileged or work product."); *Schaap v. Chi. & N.W. Ry.*, 261 Iowa 646, 649, 155 N.W.2d 531, 533 (1968) ("Privileged information is, of course, protected as is the attorney's work product.").

In interpreting section 85.27(2), the caselaw that the legislature had before it in 1976 would seem more germane than any word choices we may have made since then. *See Jahnke v. Inc. City of Des Moines*, 191 N.W.2d 780, 787 (Iowa 1971) ("We assume the legislature knew the existing state of the law and prior judicial interpretations of similar statutory provisions. We assume, too, its use of terms was in the accepted judicially established context unless there is clear evidence to the contrary."); *see also Iowa Farm Bureau Fed'n v. Envtl. Prot. Comm'n*, 850 N.W.2d 403, 434 (Iowa 2014) ("The legislature is presumed to know the state of the law, including case law, at the time it enacts a statute." (Internal quotation marks omitted.)).

Additionally, as the Institute observes, Iowa Code section 85.27(2) is only directed at employees, employers, and insurers. Work product, however, is often in the possession or control of the attorney, and a client cannot unilaterally waive the work product doctrine as to materials he or she does not have. *See Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 294 (4th Cir. 2004) ("[T]he ability to protect work product normally extends to both clients and attorneys, and the attorney or the client, expressly or by conduct, can waive or forfeit it, *but only as to himself*." (Alteration in original.) (Internal quotation marks omitted.)); *MapleWood*

*Partners, L.P. v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 619 (S.D. Fla. 2013) ("Immunity from production of work-product materials may be asserted by either the attorney or the client, and each can waive that immunity, but only as to herself, as both the attorney and the client benefit from the privilege."). This tends to support the view that the section is concerned with medical records that might otherwise be covered by the physician–patient privilege or other health care privileges, not work product materials.

4. *Presumption against superfluous words.* Another principle of statutory interpretation is that "[w]e presume statutes or rules do not contain superfluous words." *State v. McKinley*, 860 N.W.2d 874, 882 (Iowa 2015); *see also* Iowa Code § 4.4(2) (setting forth the presumption that "[t]he entire statute is intended to be effective").

Iowa Code section 85.27(2) provides, among other things, that "[a]ny employee, employer or insurance carrier making or defending a claim for benefits . . . waives any privilege for the release of the information." Iowa Code § 85.27(2). Core Group points out that if "privilege" is limited to health-care-related privileges, the language of the section is broader than it needs to be, because employers and insurers do not have such privileges to waive.

This argument is not without force, but it should not be overstated. Employers and insurers could have access to medical records that the employee does not have. Thus, it was necessary to include them in section 85.27(2). And it is true that employers and insurers do not get to assert a physician–patient privilege for the benefit of a patient who has waived that privilege. So technically speaking, it was not necessary for the legislature to have "employer" and "insurance carrier" remain part of

the subject for the last clause of the sentence. Thus, the legislature could have used more words and drafted the statute as follows,

> Any employee, employer or insurance carrier making or defending a claim for benefits agrees to the release of all information to which the employee, employer, or carrier has access concerning the employee's physical or mental condition relative to the claim and further [any employee] waives any privilege for the release of the information.

When one reads this longer, less readable version, it suggests an alternative explanation for why the legislature wrote the law the way it did: The legislature may have simply opted for cleaner, more abbreviated language. Under this view, although the wording of the last clause sweeps somewhat more broadly than necessary, the breadth does not change the substantive meaning of the statute, but merely reinforces that employers and insurers need to produce the records.

5. *Avoiding absurd results.* We have long recognized that statutes should not be interpreted in a manner that leads to absurd results. *See* Iowa Code § 4.4(3) (setting forth a presumption that "[i]n enacting a statute . . . [a] just and reasonable result is intended"); *id.* § 4.6(5) (noting that when a statute is ambiguous, we should consider "[t]he consequences of a particular construction"). In order to apply this well-established rule, we sometimes consider fact patterns other than the one before the court to determine if a particular statutory interpretation would have untoward consequences. *See, e.g., State v. Hoyman*, ___ N.W.2d ___, ___ (Iowa 2015); *Andover Volunteer Fire Dep't v. Grinnell Mut. Reins. Co.*, 787 N.W.2d 75, 86 (Iowa 2010); *Bell Bros. Heating & Air Conditioning v. Gwinn*, 779 N.W.2d 193, 207 (Iowa 2010); *State v. Carpenter*, 616 N.W.2d 540, 544 (Iowa 2000). That is part of the judicial function—to consider alternative statutory interpretations and see where those alternatives logically lead.

Applying this principle in the case at hand reveals a problem with Core Group's reading of the statute. If "all information" means all information and not merely, in context, all health care provider information, Core Group's interpretation would eliminate *all* privileges and protections—e.g., work product, attorney work product, attorney–client, priest–penitent—to the extent the item refers to the employee's physical condition. We believe that is an absurd result that could not have been intended by the legislature.

In fact, the commissioner's declaratory order implicitly recognizes the absurdity of such a result. On page 7 of his order, the commissioner states "that the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation are not waived by Iowa Code section 85.27(2)." While we understand the impulse to carve out and preserve upper-tier work product, the declaratory order fails to explain *what* in section 85.27(2) shields upper-tier but not lower-tier work product from discovery. The order is internally inconsistent—a serious flaw in our view.

6. *Legislative history.* In construing an ambiguous statute, the court may consider "[t]he circumstances under which the statute was enacted" and "[t]he legislative history." *See* Iowa Code § 4.6(2)–(3). Here the bill explanation indicates that section 85.27(2) relates to "the release of information concerning a person's *past* physical or mental condition." *See* H.F. 863, 66th G.A., 2d Sess. explanation (1976) (emphasis added).

"[W]e give weight to explanations attached to bills as indications of legislative intent." *Star Equipment, Ltd. v. State*, 843 N.W.2d 446, 454 (Iowa 2014) (internal quotation marks omitted); *see also Postell v. Am. Family Mut. Ins. Co.*, 823 N.W.2d 35, 49 (Iowa 2012) (same). We have recently explained the relevance of legislative explanations:

The legislature enacts the bill—not the accompanying explanation. But, the internal rules governing the general assembly require the title and explanation to be accurate. An explanation or title included when a bill is introduced may become irrelevant when the text of the bill is materially changed by subsequent amendments. But, when the explanation accompanies the text of the bill enacted without a relevant substantive change, the explanation is part of the legislative history that can be examined in our efforts to determine the meaning of the text.

*Star Equipment*, 843 N.W.2d at 454 n.3 (citations omitted).

Surveillance for litigation purposes would not normally be classified as information concerning a person's "past" physical or mental condition. Rather, it is typically conducted after a claim has been brought. This tends to support the Institute's proposed interpretation of Iowa Code section 85.27(2).

Of course, there is the truism that once information like surveillance has been gathered, it always relates to the "past." But such a reading of the explanation would render the word "past" redundant to the word "information." A more logical reading of the explanation is that the word "past" refers to information that had been obtained before the claim was filed. Ensuring the exchange of prior health care records appears to have been the legislature's main purpose in enacting section 85.27(2).

7. *Prior administrative interpretations.* The commissioner's declaratory order also appears to be inconsistent with long-held administrative views of the agency. *See Ramirez v. Riverview Care Ctr.,* Iowa Workers' Comp. Comm'n Nos. 1243830, 1253740, 1253741, 1253742, 1253743, 2002 WL 32125248, at *2 ("Under the prevailing rule, surveillance materials may be withheld as privileged work product for a reasonable time until the party observed can be deposed or otherwise compelled to take a position on the facts pertinent to the

surveillance. They may not be withheld after the 30-day case preparation deadline in the hearing assignment order." (Citations omitted.)); *Hansen v. Graham Constr.*, Iowa Workers' Comp. Comm'n No. 1171846, 2000 WL 33992554, at *8 ("[D]efendants, upon a proper discovery request, are to provide to claimant the results of any surveillance conducted but may postpone doing so until claimant has been deposed."); *Hoover v. Iowa Dep't of Agric.*, Iowa Workers' Comp. Comm'n No. 529205, 1993 WL 13021598, at *4 (approving defendants' withholding of surveillance material from disclosure in discovery until after the claimant's deposition "to protect the impeachment value of the evidence until after claimant's deposition, where sufficient time remained before hearing for claimant to avoid prejudice by examining the evidence and cross-examining the surveillance witnesses").

"Longstanding administrative interpretations are entitled to some weight in statutory construction." *Griffin Pipe Prods. Co. v. Bd. of Review*, 789 N.W.2d 769, 775 (Iowa 2010). It is true, as we have already said, that we must interpret section 85.27(2) ourselves, but at a minimum the durability of the previous interpretation is worth noting. The commissioner correctly observes that these agency cases did not specifically discuss Iowa Code section 85.27(2). Still, section 85.27(2) is a bread-and-butter statute regularly administered by the agency. If it was viewed as having any relevance to the discoverability of surveillance, it seems likely that one of these decisions would have mentioned it.

8. *The rule in other jurisdictions.* Although we have not found another jurisdiction with a statute that resembles Iowa Code section 85.27(2), it appears that most jurisdictions to have considered the issue allow the responding employer to withhold production of surveillance until after the employee's deposition—while requiring the surveillance to

be produced before the hearing. *See, e.g., Ex parte Doster Constr. Co.*, 772 So. 2d 447, 451 (Ala. 2000) ("[T]he quest for the truth should be furthered through protecting the videotape before the employee is deposed."); *Congleton v. Shellfish Culture, Inc.*, 807 So. 2d 492, 495–96 (Miss. Ct. App. 2002) (upholding as "fair to both parties" a procedure under which the employer provided notice of the existence of surveillance prior to the employee's deposition, but did not produce the surveillance itself until after the deposition); *De Marco v. Millbrook Equestrian Ctr.*, 732 N.Y.S.2d 121, 122 (App. Div. 2001) (affirming a determination by the workers' compensation board that the employer was not obligated to turn over a copy of the surveillance video until after the employee's deposition); *see also* Comm'n on Official Legal Pubs., *Connecticut Practice Book* § 13-3(c), at 214 (2015) (requiring production of films, photographs, and audiotapes "thirty days after the completion of the deposition of the party who is the subject" of surveillance); N.J. Admin. Code § 12:235-3.11(a)(4)(i) (West, Westlaw current through amendments dated May 18, 2015) ("A party is not required to provide or exhibit electronic information, including surveillance tapes, to another party prior to the other party's testimony under oath.").

Missouri is the only state clearly to take a contrary approach. It requires predeposition disclosure of surveillance in workers' compensation proceedings but on the rationale that this is a "statement" by the claimant and, therefore, discovery provisions allowing a person to obtain his or her own statement apply. *See, e.g., State ex rel. Feltz v. Bob Sight Ford, Inc.*, 341 S.W.3d 863, 866–68 (Mo. Ct. App. 2011). Respectfully, we do not agree that an employee engaging (or not engaging) in physical activity for its own sake is making a "statement." *See* Iowa R. Evid. 5.801(*a*) (defining a statement as "(1) an oral or written

assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion"). The commissioner does not rely on such a justification for his declaratory order.

This center of gravity in the authorities suggests, at a minimum, that allowing an employer or an employer's attorney to withhold surveillance until after the employee's deposition does not undermine the policies behind workers' compensation. Notably, the foregoing jurisdictions, like Iowa, place a high value on getting benefits in the hands of injured workers. *See Ex Parte Lumbermen's Underwriting Alliance,* 662 So. 2d 1133, 1137 n.3 (Ala. 1995) (referring to "the public policy behind the adoption of workers' compensation acts—to provide necessary day-to-day financial support to an injured worker and the worker's dependents"); *Pietraroia v. Ne. Utils.,* 756 A.2d 845, 854 (Conn. 2000) (noting that the workers' compensation act "is remedial and must be interpreted liberally to achieve its humanitarian purposes" (internal quotation marks omitted)); *Metal Trims Indus., Inc. v. Stovall,* 562 So. 2d 1293, 1297 (Miss. 1990) ("Because of the broad policy declarations made by the Mississippi Legislature in adopting the Worker's Compensation Act, this Court has given liberal construction to the compensation statutes."); *Fitzgerald v. Tom Coddington Stables,* 890 A.2d 933, 938 (N.J. 2006) ("We have consistently held that our statutory workers' compensation scheme is remedial social legislation and should be given liberal construction in order that its beneficent purposes may be accomplished." (Internal quotation marks omitted.)); *Crosby v. State Workers' Comp. Bd.,* 442 N.E.2d 1191, 1195 (N.Y. 1982) ("The broad scheme of compensation for work-related injuries or death contained in the Workers' Compensation Law has as its purpose the provision of a

swift and sure source of benefits to injured employees or the dependents of deceased employees."

Iowa's underlying workers' compensation goals are not unique. Other jurisdictions have found those goals can be met while allowing surveillance to be withheld until the claimant is deposed.

9. *Policy considerations.* Finally, both sides to this proceeding argue that sound policy is on their side. Core Group urges that immediate disclosure of surveillance materials should occur because the workers' compensation system "is designed to be essentially nonadversarial. Whatever its faults, real or imagined, the system presupposes that all workers will benefit more if claims are processed routinely and paid quickly." *Morrison v. Century Eng'g,* 434 N.W.2d 874, 877 (Iowa 1989). Core Group contends that the workers' compensation is a system where the parties should put their cards on the table as early as possible so that, if possible, the claim can be resolved quickly. Also, surveillance can still have impeachment value, even if the deponent has seen it beforehand.

The Institute responds that the fundamental purpose of the workers' compensation statute is "to benefit the injured workers," *see Jacobson Transp. Co. v. Harris*, 778 N.W.2d 192, 197 (Iowa 2010), and putting the worker under oath before he or she has seen any surveillance helps one determine whether the worker is injured as claimed. According to the Institute, truly injured workers—the intended beneficiaries of workers' compensation law—do not need to see surveillance of themselves before they testify under oath in a deposition. It is those who testify falsely about physical limitations who get impeached effectively by video recordings they have not seen. Trial lawyers are taught at an early age not to show their impeachment

material to a witness and ask him or her to "explain" it, but to get the witness to commit to a story before revealing the impeachment evidence. This is viewed as an effective way to expose the witness who is not telling the truth.

Certainly, in the workers' compensation field, assessing the claimant's credibility is vitally important. Many claimants suffer from workplace-related impairments that are more serious than the purely objective medical findings might indicate. They deserve to be compensated. On the other hand, some claimants exaggerate their symptoms.

In sum, there are valid policy reasons for and against requiring predeposition disclosure of surveillance in workers' compensation claims.

10. *Conclusion.* Reasonable arguments can be made for and against the commissioner's interpretation of Iowa Code section 85.27(2). In the end, however, we are persuaded that the section is directed at health care provider records and not at any information that might have any bearing on an employee's physical or mental condition, including work product surveillance. Section 85.27(2) does not refer to attorneys, does not mention discovery barriers other than "privileges" (which the work product immunity is not), and falls within a code provision that is otherwise limited to health care services.

Most importantly, the commissioner's interpretation has no limiting principle. If all means all, then even an attorney–client privileged email from a claimant to her attorney discussing her impairment would have to be produced—an outcome that even the commissioner is unwilling to countenance. Hence, we find the declaratory order erroneously determined that Iowa Code section 85.27(2) applies to surveillance.

**C. Other Issues**. The commissioner's declaratory order, as we have noted, was limited to section 85.27(2). The commissioner did not reach question (i), the only question that did not involve interpretation of section 85.27(2). We believe our opinion should be similarly limited.

In an actual workers' compensation proceeding, a determination that section 85.27(2) does not require disclosure of surveillance would not resolve all potential discovery issues. Other potential issues include these questions: (1) Does surveillance taken for litigation purposes lose its work product status under Iowa Rule of Civil Procedure 1.503(3) when a determination is made that the surveillance will be used at the hearing? (2) Does a party have substantial need for access to surveillance and is the party unable to obtain the substantial equivalent without undue hardship if the surveillance is going to be used at the hearing? (3) If a party can withhold access to surveillance on the basis that it is work product, what disclosures must the party make in a privilege log? *See* Iowa R. Civ. P. 1.503(3), (5)(*a*). These matters arise, as well, in ordinary civil litigation and are discussed only in passing in the parties' briefs. We believe a ruling on these civil procedure questions would have a wide impact outside of workers' compensation and should await a case or cases in which they are fully briefed and squarely presented.

**IV. Conclusion.**

The commissioner did not err or abuse his discretion in ruling on Core Group's petition for declaratory order. However, we conclude the commissioner erroneously interpreted Iowa Code section 85.27(2). *See* Iowa Code § 85.27(2). For the foregoing reasons, we set aside the commissioner's order interpreting Iowa Code section 85.27(2) as

requiring the production of postclaim surveillance to the employee before the employee's deposition.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Hecht, J., who concurs in part and dissents in part, and Zager, J., who takes no part.

**HECHT, Justice (concurring in part and dissenting in part).**

I agree with the majority on the procedural question, but disagree on the substantive one. In my view, the majority has overlooked the nuances attending Core Group's petition and the important differences between workers' compensation cases and general civil litigation. Because I find the majority's reasoning unpersuasive, I respectfully dissent in part.

The majority relies on rules of statutory interpretation to interpret section 85.27(2), but omits one very important rule specifically applicable in workers' compensation cases: "a fundamental purpose of the workers' compensation statute is to benefit . . . injured workers." *Jacobson Transp. Co. v. Harris*, 778 N.W.2d 192, 197 (Iowa 2010); *accord Xenia Rural Water Dist. v. Vegors*, 786 N.W.2d 250, 257 (Iowa 2010) ("We apply the workers' compensation statute broadly and liberally in keeping with its humanitarian objective . . . ."); *Griffin Pipe Prods. Co. v. Guarino*, 663 N.W.2d 862, 865 (Iowa 2003) ("[T]he primary purpose of chapter 85 is to benefit the worker and so we interpret this law liberally in favor of the employee."). Applying the statute broadly and liberally consistent with our longstanding practice, I conclude the commissioner's interpretation of section 85.27 is correct. Accordingly, I would affirm the decisions of the district court and the court of appeals.

## I. Whether Section 85.27(2) Applies to Surveillance Materials.

The majority concludes the phrase "all information" in section 85.27(2) means "all *medical* information" and "the employee's physical or mental condition" actually means "the employee's *past* physical or mental condition." *See* Iowa Code § 85.27(2). It does so on the ground that other subsections of section 85.27 are more directly applicable in

particular medical contexts, and because the bill book containing the house file enacted in 1976 features an explanation stating the bill made revisions "concerning a person's past physical or mental condition." H.F. 863, 66th G.A., 2d Sess. explanation (Iowa 1976). I disagree.

I would not read implied limitations into section 85.27(2) because I conclude "all information" really means all information. "[T]he word 'all' has an important use. If it has no significance . . . it might as well be dropped from the language as superfluous." *Parsons v. Parsons*, 66 Iowa 754, 762, 24 N.W. 564, 565 (1885). "All" has a plain meaning that "is commonly understood and usually does not admit of an exception, addition or exclusion." *Consol. Freightways Corp. of Del. v. Nicholas*, 258 Iowa 115, 121, 137 N.W.2d 900, 904 (1965). When a statute contains the word "all," this court has said it sees "no logical reason to hold [the statute] means less than it says." *Cedar Rapids Cmty. Sch. Dist. v. City of Cedar Rapids*, 252 Iowa 205, 211, 106 N.W.2d 655, 659 (1960).

The decisions of this court have given the word "all" a very broad meaning. *See, e.g., Luttenegger v. Conseco Fin. Servicing Corp.*, 671 N.W.2d 425, 434 (Iowa 2003); *Barron v. State Farm Mut. Auto. Ins. Co.*, 540 N.W.2d 423, 426 (Iowa 1995); *In re Peers' Estate*, 234 Iowa 403, 411, 12 N.W.2d 894, 898 (1944); *Grimes v. Nw. Legion of Honor*, 97 Iowa 315, 324, 64 N.W. 806, 808 (1895) ("[T]he legislature, by the use of the words 'all insurance companies or associations,' intended to cover every form of insurance."); *State v. Hutchison*, 72 Iowa 561, 562–63, 34 N.W. 421, 421 (1887) (concluding a statutory prohibition against "all intoxicating liquors whatever" included alcoholic cider manufactured from apples). I would again give the word a broad meaning in this case.

I find our decision in *Consolidated Freightways* instructive. *See Consol. Freightways Corp.*, 258 Iowa at 121, 137 N.W.2d at 904. There

we concluded the plain meaning of the word "all" rebutted a contention "that the words 'all states' and 'total fleet miles' . . . refer to 'all *apportioning* states' and to 'total fleet miles *in apportioning states*.' " *Id.* I similarly reject the majority's conclusion that in the context of section 85.27(2) "all information" actually means "all *medical* information" and "the employee's physical or mental condition" actually means "the employee's *past* physical or mental condition." *See* Iowa Code § 85.27(2). We should "not write such . . . provision[s] into the statute in the guise of interpretation." *Clarke Cnty. Reservoir Comm'n v. Abbott*, 862 N.W.2d 166, ___ (Iowa 2015).

I acknowledge that in some cases we have concluded the word "all" meant something short of all-inclusive. *See, e.g.*, *In re Estate of Troester*, 331 N.W.2d 123, 126 (Iowa 1983); *Johnson v. Bd. of Adjustment*, 239 N.W.2d 873, 880–81 (Iowa 1976); *Silver Lake Consol. Sch. Dist. v. Parker*, 238 Iowa 984, 997, 29 N.W.2d 214, 221 (1947); *In re Licenses for Sale of Used Motor Vehicles*, 179 N.W. 609, 611 (Iowa 1920). The majority concludes these cases are a sufficient counterweight to the truism that all means all. Notably, however, *none* of these cases in which we concluded the word "all" meant something less than all-inclusive presented a question requiring interpretation of our workers' compensation statute.

When deciding workers' compensation issues, this court has consistently refused to read terms into chapter 85 that are not there expressly, because doing so would create a narrow construction incompatible with the statute's benevolent purpose. *See, e.g.*, *Holstein Elec. v. Breyfogle*, 756 N.W.2d 812, 816 (Iowa 2008); *Cedar Rapids Cmty. Sch. v. Cady*, 278 N.W.2d 298, 299 (Iowa 1979); *Disbrow v. Deering Implement Co.*, 233 Iowa 380, 392, 9 N.W.2d 378, 384 (1943); *see also*

*Andover Volunteer Fire Dep't v. Grinnell Mut. Reins. Co.*, 787 N.W.2d 75, 88 (Iowa 2010) (Hecht, J., concurring specially) (writing separately to question an interpretation of a statute that "results in an embellishment of the words chosen by the legislature"). Unfortunately, today's majority is not faithful to this well-established maxim.

Despite the indisputably broad language in section 85.27(2) and the notion that chapter 85 should be interpreted broadly, the majority concludes the words "all information" in section 85.27(2) must mean something less than all information because the legislature placed them among other subsections referring to medical treatment for work-related injuries. I disagree. The legislature could, of course, have narrowly limited the scope of information released under subsection (2) to "records of medical services." But it did not. *See Nelson v. Lindaman*, ___ N.W.2d ___, ___ (Iowa 2015) (concluding a statute should be interpreted broadly because if the legislature wanted to limit the statute's scope, "it would have said so, as it has in other statutes"). The legislature chose instead to define the release broadly to include "all information to which the employee, employer, or carrier has access concerning the employee's physical or mental condition relative to the claim." Iowa Code § 85.27(2). It is in my view perfectly sensible that the legislature intended a broad understanding of the words "all information" in this context. Surveillance showing a workers' compensation claimant's physical activity can provide information that is exquisitely relevant to the determination of physical capacity and disability—matters which depend in significant part upon medical opinions and substantially impact medical diagnosis and treatment. Accordingly, I conclude the commissioner correctly interpreted "all information" in subsection (2) to include surveillance information.

I also find unpersuasive the majority's conclusion that the commissioner's interpretation of section 85.27(2) would lead to absurd results. There is nothing absurd about a statutory framework requiring all parties to a workers' compensation case to open their files and release all information about the claimant's physical or mental condition. The commissioner's interpretation requiring such disclosure comports quite comfortably with the purpose of workers' compensation proceedings—to enable prompt, inexpensive resolution of claims. *See Flint v. City of Eldon,* 191 Iowa 845, 847, 183 N.W. 344, 345 (1921) (noting the purpose and intent of workers' compensation "is to avoid litigation, lessen the expense incident thereto, . . . and afford an efficient and speedy tribunal to determine and award compensation"). That purpose is more likely achieved when parties are required to reveal to each other all information relevant to claimants' physical or mental condition, rather than holding some of it back in the hope of maximizing a potential litigation advantage.

The majority's assertion that the commissioner's interpretation of section 85.27(2) would jeopardize a wide array of privileges is unconvincing. The declaratory order in fact addresses a single privilege—work product—not several. Indeed, the waiver of that single privilege under the commissioner's interpretation of the statute is limited to a very narrow category of information including only surveillance and does not purport to address whether spousal communications or priest–penitent conversations must be released. The scope of the disclosures required by the commissioner's order is further limited by its preservation of work product protection for the mental impressions and conclusions of employers, their insurers, or their attorneys. Thus, under the commissioner's interpretation of section 85.27(2), the sky would not

fall and the evidentiary floodgates would not open. Surveillance information left unprotected by the work product privilege would only include videos, photographs, and surveillance reports evidencing the physical or mental condition of the claimant.

I also dispute that the bill book explanation of the statute in 1976 referring to "*past* physical or mental condition" supports the majority's reasoning in this case. Because surveillance is "typically conducted after a claim has been brought," the majority concludes the general assembly did not include surveillance information within the universe of information that must be released under section 85.27(2). But this temporal analysis does not hold together when placed in the practical context of workers' compensation cases. Surveillance materials, like medical records and reports, address a claimant's physical or mental condition as of a particular moment in time. At all times after such materials, records, and reports have been created, they are accurately described as evidencing a past condition of the claimant. Thus, under section 85.27(2), parties must release all relevant medical records and reports pertaining to workers' compensation claimants whether they were generated before or after the injury that is the subject of the proceeding— or before or after the workers' compensation contested case was commenced—because they are "past records" by the time they are released. This statutory requirement to release all relevant medical records without regard to temporal considerations is essential to proper processing and management of claims. For this reason, I believe the word "past" in the bill book explanation cannot plausibly deserve the significance suggested by the majority. Because the general assembly must have intended in section 85.27(2) that all relevant medical records be released by all parties without regard to when they were generated

because they evidence the physical or mental condition of the claimant, I believe the commissioner correctly concluded all surveillance materials and reports probative of physical or mental condition must be released upon request.

Furthermore, the majority's reliance on the 1976 legislative explanation ignores well-established principles of statutory interpretation. We determine legislative intent "by what the legislature said, rather than what it should or might have said." Iowa R. App. P. 6.904(3)(*m*) (providing this rule of statutory interpretation is "so well established that authorities need not be cited" to support it); *see also* Iowa Code § 4.6(3), (7) (permitting courts interpreting a statute to consider legislative history and statements of policy only if the statute itself is ambiguous). Here, "the word 'all' . . . is not limited in any way. That is clear, so we need not engage in statutory construction." *Barron*, 540 N.W.2d at 426. Additionally, "[t]he legislature enacts the bill—not the accompanying explanation." *Star Equip., Ltd. v. State*, 843 N.W.2d 446, 454 n.3 (Iowa 2014). I see a significant difference between the accompanying explanation of section 85.27(2) and other indications of legislative intent expressly approved by the legislature and included *within*—not just alongside—a particular enactment. *See, e.g., LSCP, LLLP v. Kay-Decker*, 861 N.W.2d 846, 861 (Iowa 2015); *Roberts Dairy v. Billick*, 861 N.W.2d 814, 820 (Iowa 2015).

There is yet another problem with the majority's interpretation of section 85.27(2) limiting the waiver to the claimant's interest in confidentiality of medical records: It renders part of section 85.27(2) superfluous. *See Rojas v. Pine Ridge Farms, L.L.C.*, 779 N.W.2d 223, 231 (Iowa 2010) ("We . . . presume the legislature included all parts of the statute for a purpose, so we will avoid reading the statute in a way that

would make any portion of it redundant or irrelevant."). Section 85.27(2) expressly extends the interests waived to those of "[a]ny employee, *employer, or insurance carrier* making or defending a claim for benefits." Iowa Code § 85.27(2) (emphasis added). But if, as the majority concludes, the waiver implemented in section 85.27(2) is limited to medical records and information for which a claimant could claim a physician–patient privilege, employers and their insurance carriers will never be subject to it. Employers and their insurance carriers have no physician–patient privilege in such information to waive, and their inclusion in section 85.27(2) among those waiving an interest would be entirely superfluous. We should give effect to every part of the statute, if possible. *See Rojas*, 779 N.W.2d at 231; *Beier Glass Co. v. Brundige*, 329 N.W.2d 280, 285 (Iowa 1983) ("[W]e construe a statute . . . based on our presumption the legislature intended every part for a purpose."). The commissioner's declaratory order gives effect to the words "employer or insurance carrier" by correctly concluding the waiver effected by the statute requires release of surveillance information evidencing a claimant's physical or mental condition.

The majority dismisses this point by suggesting the legislature really *meant* to impose the waiver under section 85.27(2) only on employees but obscured that intent in favor of "cleaner" language expressly imposing it on all parties to workers' compensation cases. In my view, this explanation is doubtful at best. As noted above, it fails completely to account for the general assembly's language waiving the employer and insurer's privilege in information. The majority's solution of the problem is to write out of the statute the troublesome words expressly eliminating a privilege otherwise held by employers and their insurance carriers. I believe the commissioner's understanding of the

statute—one consistent with the canon that we interpret statutes to give meaning to all their words when possible—breathes life into all of its words. Because the employer or insurer has no protected or protectable interest in the claimant's medical records whether the claimant possesses them or not, I conclude the general assembly must have intended a waiver of some interest other than the physician–patient privilege. I find the commissioner's interpretation of section 85.27(2) more persuasive than the majority's in part because it gives meaning to the words of the statute extending the waiver to surveillance information held by the employer or its insurance carrier—information that would otherwise be protected by the work product doctrine.

## II.  Whether Section 85.27(2) Waives Work Product Protection.

The majority concludes section 85.27(2) cannot effect a waiver of work product protection because the work product doctrine provides qualified *immunity* from discovery rather than a "privilege." This characterization of the work product doctrine emphasizes form over substance and adopts a semantic label without considering how work product protection actually operates.

**A.  Limited Scope of Inquiry.**  I do not dispute that there are "two tiers of work product recognized by Iowa rule 1.503(3)." *Keefe v. Bernard*, 774 N.W.2d 663, 674 (Iowa 2009). I also do not dispute that surveillance materials constitute work product in the civil litigation context because they are documents or tangible things prepared by or for a party in anticipation of litigation. *See* Iowa R. Civ. P. 1.503(3). However, the types of surveillance materials for which Core Group requested a declaratory order—videos, photos, and factual reports—will never fall within the upper tier of work product, because they do not reveal mental impressions and conclusions. Accordingly, the majority's

warning that section 85.27(2) might waive other privileges—for example, priest–penitent privilege—and the inconsistency it perceives in the commissioner's ruling are in my view red herrings.

The commissioner's ruling did not need to explain which part of section 85.27(2) justifies a distinction between upper-tier and lower-tier work product because the distinction does not flow from the statute at all; it flows from the nature of the materials and their obvious relevance to a claimant's physical or mental condition. Further, as I have already noted, the commissioner's declaratory order proceeding did not address any other privileges. Accordingly, there is no need to address other privileges in our decision because their continuing vitality in workers' compensation cases was not at issue in the agency and is not before the court on appeal. *See Morrison v. Century Eng'g*, 434 N.W.2d 874, 876–77 (Iowa 1989) (addressing only the physician–patient privilege because that was the only question presented); *see also* Eugene Volokh, *The Mechanisms of the Slippery Slope*, 116 Harv. L. Rev. 1026, 1137 (2003) ("The slippery slope is in some ways a helpful metaphor, but as with many metaphors, it starts by enriching our vision and ends by clouding it."); *cf. State v. Thompson*, 836 N.W.2d 470, 495 n.8 (Iowa 2013) (Appel, J., concurring specially) (resisting "any slippery-slope-type argument regarding . . . other privileges" because "the only issue before the court involves the application of [a particular statute] . . . to the facts at hand").

**B. Immunity Versus Privilege.** The majority concludes section 85.27(2) does not eliminate work product protection for surveillance information because the work product doctrine provides immunity from discovery rather than an evidentiary privilege. The terms "immunity" and "privilege" have been used alternatively in our caselaw. The majority suggests our alternating use of the terms merely illustrates that the

court's word choices are occasionally imprecise. I can accept that premise, but only if we also accept that the general assembly uses imprecise language on occasion, too, and that it may have done so in this particular statute. Unlike the majority, I do not presume the general assembly's use of the word "privilege" and the Institute's characterization of work product protection as a procedural immunity are dispositive of the issue before us.[9] Instead, I evaluate substance rather than form— and because work product protection operates *in practice* in the same manner as other evidentiary privileges, I consider it a privilege for purposes of section 85.27(2).

In a general sense, both "privilege" and "immunity" concepts place the burden of proof on the party asserting protection. *See Anderson v. State*, 692 N.W.2d 360, 364 (Iowa 2005) (discretionary function immunity); *AgriVest P'ship v. Cent. Iowa Prod. Credit Ass'n*, 373 N.W.2d 479, 482 (Iowa 1985) ("One resisting discovery through assertion of a privilege has the burden to show the privilege exists and applies."). But, once established, an immunity leads courts to only one possible conclusion, while a privilege does not. In other words, an opposing party cannot override a claim of immunity based upon their substantial need for information or other ground; they can only assert the immunity does not apply. But an opponent *can* override an adversary's claim of privilege with a proper showing. *See, e.g., In re A.M.*, 856 N.W.2d 365, 373 (Iowa 2014) (applying a statutory exception to the psychotherapist–patient privilege); *State v. Countryman*, 572 N.W.2d 553, 561 (Iowa 1997)

---

[9]With respect to the analogous federal rule, the authors of a preeminent federal practice manual suggest the difference between "privilege" and "immunity" is purely a matter of nonsubstantive semantics. 8 Charles Alan Wright et al., *Federal Practice & Procedure* § 2023, at 492–94 (3d ed. 2010) ("This matter of nomenclature should . . . *not continue to be of importance*." (Emphasis added.)).

(recognizing two exceptions to the marital-communications privilege); *Chung v. Legacy Corp.*, 548 N.W.2d 147, 150–51 (Iowa 1996) (exploring the patient–litigant exception that overrides the physician–patient privilege when the party claiming the privilege places their condition at issue).

The framework of rule 1.503(3) best fits the privilege framework. Although a party can establish that a requested document or item is protected work product, the party seeking that document or item can still obtain it upon a showing of substantial need and undue hardship. *See* Iowa R. Civ. P. 1.503(3). Because the work product doctrine, like evidentiary privileges, is subject to override upon an opponent's proper showing, it is more like a privilege than an immunity. *Cf. Bob McKiness Excavating & Grading, Inc. v. Morton Bldgs., Inc.*, 507 N.W.2d 405, 411 (Iowa 1993) (looking "beyond the labels to the actual nature of the action" to determine the applicable statute of limitations); *Essex Ins. Co. v. Fieldhouse, Inc.*, 506 N.W.2d 772, 775 (Iowa 1993) (examining substance rather than form "[r]egardless of the label"). I reject the majority's conclusion that the "immunity" label is dispositive of the issue before us, preferring instead an analytical framework that examines the substance of the question rather than its form.

I acknowledge that work product materials including surveillance are often in the possession of attorneys rather than the employers and insurance carriers they represent. The majority concludes clients cannot unilaterally waive the work product doctrine as to materials in their attorneys' possession. Yet, the waiver under section 85.27(2) is effected by the statute, not by employers' or insurers' unilateral actions. More importantly, parties to workers' compensation proceedings must, under the statute, release not only information they have in their possession,

but also information to which they have access. Parties to workers' compensation proceedings have access to surveillance videos, photographs, and reports in the possession of their attorneys. Accordingly, I believe the clear language of the statute extends the limited waiver of the work product privilege to surveillance materials in the possession of attorneys for employers and their insurance carriers.

### III. Timing of Disclosure.

Previous agency decisions had concluded that postponing disclosure until after the claimant's deposition preserved impeachment value. However, agency decisions interpreting the law are not binding on this court. *Keystone Nursing Care Ctr. v. Craddock*, 705 N.W.2d 299, 304 n.2 (Iowa 2005) ("[T]he commissioner's final decision is judged against the backdrop of the workers' compensation statute and the Iowa appellate cases interpreting it, not previous agency decisions."). And until today, we had not confronted a case presenting the temporal question at issue here.

Surveillance materials undoubtedly have some impeachment value. *See Snead v. Am. Export-Isbrandtsen Lines, Inc.*, 59 F.R.D. 148, 150 n.1 (E.D. Pa. 1973) ("It is in the best interests of society that valid claims be ascertained and fabricated claims be exposed."). However, "surveillance footage . . . is hardly a smoking gun," even when it depicts a claimant "performing tasks inconsistent with the claimed disability." *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 848–49 (Iowa 2011).

Two Louisiana cases illustrate the important competing interests at stake in determining whether predeposition disclosure is appropriate. In *Moak v. Illinois Central Railroad*, the Louisiana Supreme Court concluded the timing of disclosure should turn on "when the production

of surveillance films, tapes or photographs will most likely assist the search for truth." *Moak v. Ill. Cent. R.R.*, 631 So. 2d 401, 406 (La. 1994). The court determined predeposition disclosure is often appropriate:

> While . . . surprise may have a healthy prophylactic effect against possible perjury, it is more likely that the adversarial process will function efficiently and cases will be decided fairly on the merits if the parties are aware of all the evidence. Furthermore, discovery of surveillance materials permits the kind of stipulations and admissions required for effective pre-trial procedures. It also encourages settlement or abandonment of less than meritorious claims.

*Id.* at 405 (citation omitted) (internal quotation marks omitted).

Several years later, the Louisiana Supreme Court distinguished *Moak*. *Wolford v. JoEllen Smith Pyschiatric Hosp.*, 693 So. 2d 1164, 1166–67 (La. 1997). The court concluded the unique impeachment value of surveillance justifies a per se rule preventing disclosure before the plaintiff's deposition. *See id.* at 1167. The court explained:

> Surveillance videotape picturing the plaintiff engaged in physical activity has the potential to reveal inconsistencies between the plaintiff's claimed injuries and resulting limitations and the plaintiff's actual abilities. However, any potential impeachment value would be destroyed by ordering pre-deposition disclosure of such surveillance materials. If the plaintiff were to view the surveillance videotape prior to being deposed as to his physical injuries and limitations during the time period pictured in the videotape, he would be more likely, either inadvertently or deliberately, to tailor his testimony to correspond with the actions pictured in the videotape. . . . [D]elaying the production of the videotape until after the plaintiff has been fully deposed aids in the search for the truth.

*Id.*

The majority relies on many other cases that essentially utilize the *Wolford* rule (or something like it) and allow defendants to withhold surveillance materials until after deposing the plaintiff. *See, e.g., Smith v. Diamond Offshore Drilling, Inc.,* 168 F.R.D. 582, 587 (S.D. Tex. 1996);

*Boyle v. CSX Transp., Inc.*, 142 F.R.D. 435, 437 (S.D. W. Va. 1992); *Dodson v. Persell*, 390 So. 2d 704, 708 (Fla. 1980). But these cases constituting what the majority characterizes as a consensus are not persuasive here for several significant reasons.

First, not all courts prioritize impeachment value over "the free flow of information." *See Morrison*, 434 N.W.2d at 876. For example, one New York court stated:

> Although it is possible that a plaintiff will attempt to tailor his or her testimony after learning what the surveillance films reveal, it seems unlikely that he or she would risk going to trial knowing that the films are accurate, . . . . We believe it is more likely that disclosure will result in a settlement, or possibly a voluntary discontinuance of the lawsuit, in either case avoiding costly and time consuming litigation.

*Kane v. Her-Pet Refrigeration, Inc.*, 587 N.Y.S.2d 339, 344 (App. Div. 1992); *see also Wegner v. Cliff Viessman, Inc.*, 153 F.R.D. 154, 159–60 (N.D. Iowa 1994) ("[R]equiring discovery of surveillance by defendants . . . will not jeopardize the ability of defendants to impeach plaintiffs."); *Shields v. Burlington N. & Santa Fe Ry.*, 818 N.E.2d 851, 856 (Ill. App. Ct. 2004) ("[W]e see no need for special treatment of the substantive evidence in a surveillance videotape."); *Williams v. Dixie Elec. Power Ass'n*, 514 So. 2d 332, 335 (Miss. 1987) ("Once an opponent requests discoverable material, an attorney has a duty to comply with the request regardless of the advantage a surprise may bring.").

Second, surveillance materials sometimes are not fairly described as a smoking gun. *See Pease*, 807 N.W.2d at 848. In a personal injury case, the New Jersey Supreme Court addressed and rejected an assertion that requiring disclosure of surveillance materials would render them toothless for impeachment purposes:

> [D]efendants' position suffers from an obvious analytical weakness: it is based on the premise that defendants' evidence (in the form of the undercover films) is the exclusive repository of truth and virtue and its disclosure . . . will deprive them of the opportunity to demonstrate . . . the fraud plaintiff seeks to work upon them. While defendants do not state that assumption quite so bluntly, their argument rests upon it at least implicitly. The premise is one we can hardly indulge. It is no more unlikely that a defendant may resort to chicanery in fabricating motion pictures of one alleged to be the plaintiff than it is that a plaintiff may indeed be a faker.

*Jenkins v. Rainner*, 350 A.2d 473, 476–77 (N.J. 1976); *see also Boyle*, 142 F.R.D. at 437 ("[T]hose surveilled may be tempted to alter the truth, but . . . those conducting the surveillance may be subject to the same temptation . . . ."); *Snead*, 59 F.R.D. at 150 (questioning the purportedly unassailable nature of surveillance materials because "[a]n emergency situation may be made to appear commonplace" and a one-time event can be made to appear recurring); *Orgeron v. Tri State Road Boring, Inc.*, 434 So. 2d 65, 68 (La. 1983) ("[P]ictures or videotapes must be approached with great caution because they show only intervals of the activities of the subject, they do not show rest periods, and do not reflect whether the subject is suffering pain . . . .").[10]

Furthermore, as the Core Group suggests, in some instances surveillance information has no impeachment value whatsoever because it is probative of the physical impairment claimed by an injured employee. And even when surveillance information *does* have

---

[10]I also find unpersuasive the Institute's assertion that the claimant always knows the activities in which he or she has participated during surveillance, so disclosure would merely duplicate existing knowledge. While it is true enough in theory that a person knows what they do from day to day, I doubt most claimants have a memory so encyclopedic that they can generate, weeks or months later, the substantial equivalent of surveillance materials depicting precise moments on specific days. *See Olszewski v. Howell*, 253 A.2d 77, 78 (Del. Super. Ct. 1969) ("[E]ven assuming the plaintiff[] can recall the events of the two days in question, the precise evidence which the defendant has, the film, is now unique and cannot be reproduced.").

impeachment value, "if [it is] at all effective will [it] not also be substantive evidence going directly to . . . injuries and damages?" *Spencer v. Beverly*, 307 So. 2d 461, 462 (Fla. Dist. Ct. App. 1975) (Downey, J., specially concurring). Whether or not such information has impeachment value, it is in my view probative of a claimant's physical or mental condition and the commissioner therefore correctly declared it should be released under section 85.27(2) when requested. *See* Iowa Code § 85.27(2).

But most importantly, as I have already noted, cases adjudicating discovery disputes between plaintiffs and defendants engaged in civil litigation are qualitatively different from workers' compensation cases involving claimants and employers or insurers. Unlike personal injury actions sounding in tort or statutory actions brought under the Federal Employers' Liability Act, the workers' compensation system "is designed to be essentially nonadversarial." *Morrison*, 434 N.W.2d at 877; *see also Flint*, 191 Iowa at 847, 183 N.W. at 345 (noting the workers' compensation system is designed to "avoid litigation . . . and afford an efficient and speedy tribunal"). Thus, when considering decisions from other courts resolving work product disputes, I strongly agree with those prioritizing "the free flow of information regarding a worker's physical or mental condition relative to a compensation claim." *See Morrison*, 434 N.W.2d at 876. Sometimes the difference between types of cases is crucial. *See Williams-Yulee v. Fla. Bar*, ___ U.S. ___, ___, 135 S. Ct. 1656, 1673, ___ L. Ed. 2d ___, ___ (2015) (plurality opinion) (judges are different); *Miller v. Alabama*, 567 U.S. ___, ___, 132 S. Ct. 2455, 2464, 183 L. Ed. 2d 407, 418 (2012) (children are different). This is one such instance. I would conclude surveillance materials are discoverable "upon

request," even if requested before the claimant's deposition.[11]  Iowa Code § 85.27(2).

The commissioner's interpretation of section 85.27(2) is consistent with several other states' rules and decisions addressing surveillance materials specifically in the workers' compensation context.  *See, e.g., Camelback Contractors, Inc. v. Indus. Comm'n*, 608 P.2d 782, 785 (Ariz. Ct. App. 1980) ("[T]he hearing officer correctly determined that the surveillance tapes . . . were discoverable upon timely and properly served interrogatories."); *McNease v. Murphy Constr. Co.*, 682 So. 2d 1250, 1250–51 (La. 1996);[12] *Johnson v. Archdiocese of New Orleans*, 649 So. 2d 12, 13–14 (La. Ct. App. 1994); *Sires v. Nat'l Serv. Corp.*, 560 So. 2d 448,

---

[11]In *Squealer Feeds*, we stated "a claimant is not entitled to obtain the file of his adversary . . . merely upon request." *Squealer Feeds v. Pickering*, 530 N.W.2d 678, 688 (Iowa 1995), *abrogated on other grounds by Wells Dairy, Inc. v. Am. Indus. Refrigeration, Inc.*, 690 N.W.2d 38, 47–48 (Iowa 2004).  However, the question at issue in *Squealer Feeds* required the court to interpret and apply the civil procedure rule establishing work product protection—not answer the question presented here under section 85.27(2).  *See id.*  Thus, my conclusion is not incompatible or inconsistent with our holding in *Squealer Feeds*.  *See* Iowa Admin. Code r. 876—4.35 (providing that the provisions of chapter 85 supersede rules of civil procedure when the two conflict).

[12]The Louisiana Supreme Court distinguished *McNease* in *Bell v. Treasure Chest Casino, L.L.C.*, 950 So. 2d 654, 655–56 (La. 2007).  However, *Bell* involved security camera footage that would show the actual occurrence of an injury, not surreptitious surveillance of a claimant's postinjury activities.  *See id.* at 656.  Additionally, *Bell* is a personal injury case, whereas *McNease* is a workers' compensation case.  *Compare id.* at 655, *with McNease*, 682 So. 2d at 1250.  As I have noted, this distinction is crucial given the informal nature of workers' compensation proceedings.  Indeed, in New York the distinction is also significant, but for a different reason: workers' compensation cases are not subject to the general rule of discovery that all films, photographs, and videos are discoverable upon demand.  *Compare De Marco v. Millbrook Equestrian Ctr.*, 732 N.Y.S.2d 121, 122 (App. Div. 2001) (concluding the general discovery statute governing disclosure of surveillance is not binding on the workers' compensation board), *with Tran v. New Rochelle Hosp. Med. Ctr.*, 786 N.E.2d 444, 448 (N.Y. 2003) ("[N]otwithstanding the danger of tailored testimony, [the general statute governing disclosure of surveillance] requires full disclosure with no limitation as to timing, unless and until the Legislature declares otherwise.").  I again emphasize that personal injury cases are not always valuable analytical guides when resolving issues in the workers' compensation arena.

449 (La. Ct. App. 1990); *State ex rel. McConaha v. Allen*, 979 S.W.2d 188, 189–90 (Mo. 1998) (concluding surveillance video tapes are "statements" under Missouri's workers' compensation scheme and rules of civil procedure, and thus, claimants are always entitled to view them); Minn. R. 1420.2200(8)(A)–(B) (Westlaw current through May 13, 2015) (requiring disclosure of surveillance materials at the same time a party discloses the *existence* of surveillance, which must occur "upon discovery demand but no later than 30 days prior to the hearing date"); 34 Pa. Code § 131.61(a) (Westlaw current through Pa. Bulletin, Vol. 45, No. 22, dated May 30, 2015) (requiring parties to exchange all information, including "tapes, films and photographs," as part of their initial disclosures, without waiting for a discovery request).

Some other states utilize different procedures. *See, e.g.*, *Ex parte Doster Constr. Co.*, 772 So. 2d 447, 451 (Ala. 2000); *Congleton v. Shellfish Culture, Inc.*, 807 So. 2d 492, 495–96 (Miss. Ct. App. 2002); *De Marco v. Millbrook Equestrian Ctr.*, 732 N.Y.S.2d 121, 122 (App. Div. 2001). However, none of these states' workers' compensation schemes features any statute or rule resembling section 85.27(2). Accordingly, I would hold the commissioner's declaratory order correctly concluded the statute mandates predeposition disclosure upon request of surveillance materials. Iowa Code § 85.27(2).

**IV. Fact of Surveillance.**

One final question remains: whether the fact that surveillance exists—along with other factual details such as dates of surveillance and the form it takes—is itself protected from disclosure. The majority declines to answer this question. I conclude the fact of surveillance is not protected from disclosure, and neither are related factual details.

The caselaw reveals two competing views on this issue in the personal injury context. A decision of the Wisconsin Court of Appeals succinctly describes the position the Institute espouses here:

> A lawyer's strategic decision to invest a client's resources on photographic or video surveillance is protected work-product. The decision not only reflects the lawyer's evaluation of the strengths or weaknesses of the opponent's case but the lawyer's instructions to the person or persons conducting the surveillance also reveals the lawyer's analysis of potentially fruitful areas of investigation. . . . Disclosure of the fact of surveillance and a description of the materials recorded would thus impinge on the very core of the work-product doctrine.

*Ranft v. Lyons*, 471 N.W.2d 254, 261–62 (Wis. Ct. App. 1991). However, this appears to be a minority rule. Even in those cases allowing defendants to withhold surveillance materials until deposing the plaintiff, courts generally hold factual information regarding the surveillance receives no protection. *See, e.g.*, *Fletcher v. Union Pac. R.R.*, 194 F.R.D. 666, 668 (S.D. Cal. 2000) ("[W]hether Defendant conducted surveillance and the dates on which any surveillance took place [a]re not privileged."); *Smith*, 168 F.R.D. at 587 (requiring defendants to disclose whether they performed surveillance, when they did so, and the format of surveillance used); *Doster Constr. Co.*, 772 So. 2d at 451; *Dodson*, 390 So. 2d at 707 ("[A] party must disclose the existence of material which is or may be relevant to the issues in the cause whether as substantive, corroborative, or impeachment evidence. Relevant evidence cannot be allowed to remain hidden . . . .").

I would adopt the latter view, and I find particularly persuasive the federal court's reasoning in *Smith*:

> It may well be that the decision about if, when, or how surveillance of a plaintiff should be conducted does reveal something about how the defendant's attorney investigates and prepares a case for trial. However, not every action that

> reveals, to some minimal degree, an attorney's general strategy or approach to a case amounts to protected opinion work product. For example, the manner in which an attorney phrases his answers to interrogatories may reveal, to some degree, the attorney's strategy in defending against the plaintiff's claims. Nonetheless, the attorney could not refuse to answer the interrogatories on the grounds of the work product doctrine.

*Smith*, 168 F.R.D. at 587. Because the workers' compensation system is nonadversarial, in this context we should uphold even more doggedly the maxim that litigation by surprise is incompatible with modern-day law practice. *See Whitley v. C.R. Pharmacy Serv., Inc.*, 816 N.W.2d 378, 386 (Iowa 2012) (noting trial by surprise interferes with the search for truth); *State ex rel. Hager v. Carriers Ins. Co.*, 440 N.W.2d 386, 389 (Iowa 1989) (advancing "the basic notion of fairness . . . aimed at elimination of trials by ambush" (internal quotation marks omitted)); *cf. Simons v. State Comp. Mut. Ins. Fund*, 865 P.2d 1118, 1121–22 (Mont. 1993) (excluding surveillance footage from trial when the employer did not disclose it as an anticipated trial exhibit). Requiring employers and insurers to disclose upon request the fact of surveillance, the dates of surveillance, the form of surveillance, and the investigator's identity serves this purpose.

### V. Conclusion.

Although I agree the commissioner did not err or abuse his discretion in ruling on Core Group's petition for declaratory order, I disagree with the majority's conclusion that the commissioner erred in interpreting Iowa Code section 85.27(2). I believe the commissioner correctly interpreted section 85.27(2) as requiring parties in workers' compensation proceedings to release to a claimant—upon request—surveillance materials and factual information about such surveillance conducted in connection with the claimant's case. As both the district

court and the court of appeals reached the same conclusion as the commissioner, I would affirm their decisions.